**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN ZANG,** | ) | |
| | ) | |
| **Plaintiff** | ) | **No. 08 C 3370** |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **ALLIANCE FINANCIAL SERVICES** | ) | |
| **of ILLINOIS, LTD. and TODD STERN,** | ) | |
| **estate of BURTON STERN,** | ) | |
| | ) | |
| **Defendants** | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Before the Court are defendants' motion for summary judgment [148, re-filed at 181] and plaintiff's motion for partial summary judgment [154, re-filed at 180].[1] The parties have extensively briefed the motions and the Court heard oral argument on February 10, 2012, after which additional materials were submitted [182, 183, 187, 188].[2] For the reasons set forth below, defendants' motion for summary judgment is granted and plaintiff's motion for partial summary judgment is denied.

## I.    Background

---

[1] As explained in more detail below, defendants filed their first motion for summary judgment [107] on October 18, 2010. That motion was denied without prejudice as premature [111]. Plaintiff filed his original motion for partial summary judgment [123] on March 3, 2011. We granted plaintiff leave to withdraw that motion [147] and plaintiff subsequently filed the pending motion.

[2] Following oral argument on the pending motions, the parties agreed to participate in a settlement conference with the Court. Unfortunately, a few days before the scheduled settlement conference, defense counsel informed the Court that defendants were not interested in a settlement conference and the conference was stricken.

### A.    Factual Background[3]

### 1.    The Parties

Plaintiff John Zang ("Zang") is a resident of Michigan.  (Pl.'s LR 56.1 Statement

of Facts ("SOF") [156] ¶ 1.)  Defendant Burton Stern ("Stern"), deceased, was a resident

of Illinois and the former president and sole owner of defendant Alliance Financial

Services of Illinois, Ltd. ("Alliance").  (*Id.* ¶ 4; Defs.' LR 56.1 SOF [150] ¶ 3.)  As

explained in more detail below, Stern's son and executor of his estate, Todd Stern, has

since been substituted in this matter pursuant to Fed. R. Civ. P. 25.  (*See* 3/25/10 Order

[94].)  Alliance, now dissolved, was a closely held corporation with a principal place of

business in Chicago, Illinois.  (Pl.'s SOF ¶¶ 2, 6.)  According to defendants, the Estate

of Burton Stern is now the sole owner of the assets of Alliance.[4]  (Defs.' SOF ¶ 12.)

### 2.    Zang's Relationship with Defendants

In the Spring of 2007, Zang began exploring opportunities to acquire his own

manufacturing business.  (Pl.'s SOF at Ex. 3 - Zang Aff. ¶ 4.)  On or about June 19,

---

[3] The following facts are taken from the parties' LR 56.1 statements of fact and supporting documents.  As explained in more detail below, the majority of those facts are supported by testimony that is barred by the Illinois Dead Man's Act.  We include those facts here simply for ease of comprehension. Any disputes regarding the facts are noted.  Additionally, in a previously filed motion, defendants objected to plaintiff's LR 56.1 statement of facts, arguing that the paragraphs were neither short nor concise, and contained argument beyond fact.  (*See* Defs.' Rule 12(f) Mot. to Strike [159].)  We take little issue with the length of plaintiff's paragraphs, but we have disregarded any legal argument contained in the parties' LR 56.1 statements.  *See Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000) ("The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner: it is not intended as a forum for factual or legal argument.").

[4] In response to defendants' LR 56.1 SOF, plaintiff took issue with defendants' assertions that Stern was the sole owner of Alliance and that Stern's Estate is now the sole owner of the assets of Alliance.  (*See* Pl.'s Resp. to Defs.' LR. 56.1 [163] ¶¶ 3, 12.)  The Court questioned defendants about this issue at oral argument, at which time defense counsel explained that they did not have documentary support for these statements, but that they were based on counsel's conversations with defendants and the allegations of plaintiff's complaint.  (2/10/12 Tr. at 11-12.)  Neither party had any reason to believe that Jess E. Forrest, once listed as a registered agent for Alliance, had any involvement in Alliance.  (*Id.*)

2

2007, Zang telephoned Stern in response to an advertisement Stern placed on the website "BizBuySell.com."[5] (Pl.'s SOF ¶ 14.) The advertisement states: "Alliance Financial Services, Ltd. Listings of Profitable Manufacturing and Distribution Companies for acquisition with NO principal payments. We provide the Accounting and Business Plan." (Pl.'s SOF at Ex. 2.) In a section marked "Financing," the advertisement states that "Alliance will provide Buyer with Investment Bankers." (*Id.*) The following geographic locations are noted in the advertisement: "Greater Midwest, South WE, Illinois." (*Id.*)

At some point in June 2007, Zang traveled to Stern's office in Chicago for a meeting. (Pl.'s SOF ¶ 16.) According to Zang's Statement of Facts, as a result of that meeting, he and Alliance entered into a written "Consulting Agreement" (the "Agreement"), whereby Alliance agreed to act "in its capacity as a Consultant and accountant, and not as a partner, joint venturer, broker, or in any other capacity" to "use its best efforts to locate a company to be purchased." (*Id*; Pl.'s SOF at Ex. 4.) The Agreement also included language that the contracting "Company" acknowledges that "Alliance is not licensed in any professional capacity." (*Id.*) Appendix 3 to the Agreement states that Zang would provide a one-time retainer of $5,000 for the services to be performed under the Agreement. (*Id.*) Appendix 3 also indicates that a 3% consulting fee shall be payable "at the closing and funding of each candidate transaction." (*Id.*) "Upon the first closing under the Agreement the retainer will be refunded by deduction from the consulting fee due at closing and funding." (*Id.*) The

---

[5] "BizBuySell.com" is described on its website as "The Internet's Largest Business For Sale Marketplace." Biz Buy Sell Home Page, http://www.bizbuysell.com (last visited June 19, 2012).

version of the purported Agreement in the record before us is dated June 16, 2007 and includes only Stern's signature. (*Id.*)

Zang claims he tendered the agreed upon $5,000 retainer fee to Stern. (Pl.'s SOF ¶ 18.) To support this claim, Zang has submitted a cancelled check for $5,000, dated June 25, 2007 and made out to Alliance Financial Services. (Pl.'s SOF at Ex. 5.) "B. Stern" is listed on the memo line. (*Id.*) The check appears to have been deposited in New Century Bank account number 1017789. (*Id.*) Also on June 25, 2007, Zang contends that he sent Stern a list of seventeen companies that he was interested in evaluating as potential businesses to purchase. (Zang Aff. ¶ 12 and Ex. C.) The June 25, 2007 letter listing those businesses indicates that Stern and Zang previously had telephone conversations, but were not meeting in person at Stern's office until June 30. (Zang Aff. at Ex. C.)

In early July of 2007, Zang contacted business broker Pat Nolan of Nolan & Associates, Ltd., to inquire about purchasing Frontline Manufacturing, Inc. (Pl.'s SOF ¶ 20.) On August 3, 2007, Zang and Stern participated in a conference call with Nolan regarding that purchase. (Pl.'s SOF ¶ 21.) At some point during that call, Stern told Nolan that he had a bank that would finance 100% of the purchase price using life insurance policies as part of the collateral. (*Id.*)

Zang further claims that, at Stern's request, he provided Stern with two additional payments of $14,500 and $18,000 on July 19, 2007 and August 16, 2007, respectively. (Pl.'s SOF ¶¶ 19, 22.) The cancelled checks purporting to represent those payments are attached to plaintiff's statement of facts as Exhibits 6 and 9. The July 19 check is made out to Burton Stern and appears to have been deposited in the same New

Century Bank account that the $5,000 payment was deposited. (Pl.'s SOF at Ex. 6.) The memo line appears to read "Frontline Mfg." (*Id.*) The back of the check reads "Non Refundable Check Only at Closing" and appears to be signed by Burton Stern. (*Id.*) The August 16 check is made out to Mid America Company and the memo line reads "Pine Tech Factory." (Pl.'s SOF at Ex. 9.) That check appears to have been deposited in a different New Century Bank account, and the back reads "Non-Refund Fee To Purchase Blue [illegible] Lumber Co."[6] (*Id.*) Zang's understanding was that, upon closing of a business purchase, these payments would be deducted from the 3% commission set forth in the agreement.[7] (Zang Aff. ¶ 14.)

On December 26, 2007, Stern and Nolan had a phone conversation in which the two discussed the financing plan for Zang's prospective purchase of Frontline. (Pl.'s SOF ¶ 23.) During that call, Stern told Nolan that he had approximately $32,000 of Zang's money. (*Id.*) At his deposition, Nolan testified that although he did not recall if Stern told him what the money was provided for, Nolan presumed it was for the Frontline deal. (Pl.'s SOF at Ex. 8 - Nolan Dep. at 122.) Nolan also repeatedly testified that he had no knowledge of any specific agreement or arrangement between Zang and Stern. (*Id.* at 53-55, 77, 111.)

On March 26, 2008, Nolan and his son Patrick went to Chicago for a meeting

---

[6] In describing all three of his checks in his Memorandum in Support of Summary Judgment [155], plaintiff mistakenly provides his own account numbers as the accounts in which the checks were deposited. (*See* Mem. ¶¶ 17-18, 20.)

[7] Defendants contest the majority of the facts in the preceding three paragraphs, arguing that the facts are improperly supported by testimony barred by the Illinois Dead Man's Act, explained in more detail below. (*See* Defs.' Resp. to Pl.'s SOF [165].) Defendants also deny that the Agreement, as written, was ever agreed to by the parties or that its terms were otherwise applicable to the multiple financial exchanges alleged by plaintiff. (*Id.*)

with Stern at which they again discussed the Frontline purchase. (Pl.'s SOF ¶ 24.)
Larry Selig of the Secure Group also attended that meeting and, along with Stern,
provided a document detailing how life insurance policies would be used to collateralize
100% of the financing of Zang's loan to acquire Frontline. (Pl.'s SOF ¶ 25.) Nolan
further testified at his deposition that following that meeting, he determined that the
financing plan was not practical for the deal. (Nolan Dep. at 108.) Ultimately, the
Frontline deal did not close.

Zang contends that between June 2007 and April 2008, Stern continued to
provide him with business listings for businesses located throughout the Midwest,
including Illinois. (Pl.'s SOF ¶¶ 28, 29.) Zang also contends that he continued to submit
other businesses to Stern for evaluation. (Zang Aff. ¶ 16.) But, according to Zang,
despite the fact that no closing on any business ever took place, Stern refused to return
the $37,500 Zang had provided to him, and said that the funds would be applied to
Stern's commission once Zang finally purchased a business. (Zang Aff. ¶ 18.)
Defendants contest these facts, again citing the Dead Man's Act.

### 3. The Illinois Secretary of State Consent Order of Prohibition

Attached to plaintiff's LR 56.1 SOF, as well as his June 5, 2012 second amended
complaint [63], is a "Consent Order of Prohibition" ("Consent Order") entered by the
Illinois Secretary of State Securities Department against Alliance and Stern on March
10, 2009.[8] (Pl.'s SOF at Ex. 1.) The Consent Order makes clear that it was the result of
a "Stipulation to Enter Consent Order of Prohibition" ("Stipulation") executed by Alliance

---

[8] Plaintiff's SOF indicates that the Consent Order was entered on February 23, 2009, but the date
of that order is actually March 10, 2009.

and Stern on February 23, 2009.  (*Id.*)

According to the language of the Consent Order, "by means of the Stipulation," Alliance and Stern "acknowledged, while neither admitting nor denying the truth thereof, that the following allegations [among others] contained in the Notice of Hearing shall be adopted as the Secretary of State's Findings of Fact:"[9]

> ...
>
> 3.   That from on or about April 2006 Respondents [Alliance and Stern] individually and by and through their Officers, Directors, Employees, Affiliates, Successors, Agents and Assigns...offered and held themselves out as providing business for sale and services to potential business buyers for a fee to at least one Illinois Resident.
>
> 4.   That the Respondents' activities described at paragraph 3 are the activities of engaging in the business of acting as a Business Broker as that term is defined pursuant to Section 10-5.10 of the Illinois Business Brokers Act of 1995 [815 ILCS 307/10-1 et seq.] (the "Act").
>
> 5.   That Section 10-85(b)(1) of the Act provides, inter alia, that it is prohibited under the Act for a business broker to either directly or indirectly engage in the business of acting as a business broker without registration under the Act unless exempt under the Act.
>
> 6.   That at all times relevant hereto, the Respondents were not registered as a business broker with the Secretary of State prior to the aforementioned activities in the State of Illinois, and that on June 22, 1998 an Order of Permanent Prohibition was entered wherein Stern was permanently prohibited from registering as a business broker.
>
> 7.   That by virtue of the foregoing, the Respondents have violated Section 10-85(b)(1) of the Act.
>
> 8.   That on June 22, 1998, an Order of Permanent Prohibition was entered in the matter of Nationwide Industries Inc., its officers, directors, employees, agents, affiliates, successors and assigns... Burton Stern was found to be included in the officers, directors,

---

[9] The "First Amended Notice of Hearing" is attached as Exhibit 3 to plaintiff's second amended complaint and is dated November 19, 2008.

employees, agents, affiliates, successors and assigns of Nationwide and Stern was permanently prohibited from registering as a business broker.

9. That on or about October 5, 2007, Respondent Stern attempted to register as a Business Broker, in derogation of the prior order of this Department.

10. That section 10-5.10 of the Act provides in part: Business Broker means any person who is required to register under Section 10-10 of this Act and...(4) advertises or represents himself as a business broker.

11. That continuing to on or about February 21, 2008 Burton Stern and Alliance Financial Service LTD were listed on the http://www.bizbuysell.com in alliance with the Wall Street Journal Online as Cook County Business Brokers. That the area served by Burton Stern was listed as Cook County, Illinois at the phone number 773-697-6869. That Alliance Financial Service Ltd. had a 'featured businesses for sale' a 'Profitable Manufacturing and Dis...' with a 'cash flow $1,000,000' and 'asking: undisclosed.'. Under the heading 'About the Sale' it provided: 'Financing: Alliance will provide Buyer with Investment Bankers.' [sic].

...

(Pl.'s SOF at Ex. 1.) By means of the Stipulation, Stern and Alliance agreed, without admitting or denying the averments thereof, that the Secretary of State's Conclusions of Law would be as follows: "That the Respondents Alliance Financial Services of Illinois... and Burton Stern...have violated section 10-85(b)(1) of the Act." (*Id.*) Alliance and Stern were then prohibited from "acting as a Business Broker in or from the State of Illinois" and, on March 9, 2009, paid "$10,000 to the Office of the Secretary of State, Enforcement and Audit as reimbursement towards the costs of in [sic] this matter." (*Id.*)

## B. Procedural Background

On June 11, 2008, Zang filed his eight-count complaint against Stern and Alliance alleging the following federal and state law claims: (1) violation of the Securities

Exchange Act, (2) violation of the Illinois Consumer Fraud Act, (3) common law fraud, (4) conversion, (5) breach of fiduciary duty, (6) violation of the Lanham Act, (7) violation of the Illinois Deceptive Trade Practices Act, and (8) promissory estoppel [1].

The factual basis for Zang's claims as set forth in his initial and subsequent amended complaints (including the operative one) differs slightly from that which he relies on now, which is explained above. Specifically, in his pleadings, Zang makes no reference to a written consulting agreement. Instead, he alleges that when he went to meet Stern on June 28, 2007, Stern made representations that he would use his best efforts to locate a company for Zang to purchase and also explained his proposed financing plan involving life insurance policies. (Second Am. Compl. ¶¶ 7-8.) Zang also alleges that Stern explained that he would collect a 3% fee at the closing of a business purchase deal and required a $5,000 refundable retainer fee in order to proceed. (*Id.* ¶ 9.) Additionally, Zang refers to certain "literature," provided by Stern, which stated Alliance "do[es] NOT receive, nor handle, your funds prior to closing."[10] (*Id.*)

Despite those representations, Zang alleges that Stern merely forwarded Zang listings for companies, few of which were located in the Midwest as Zang requested. (Second Am. Compl. ¶ 11.) Zang alleges that he himself located Frontline Manufacturing and Pine Tech and instructed Alliance to purchase each company on his behalf. (*Id.* ¶ 12.) To initiate the financing process, Stern then purportedly asked Zang to provide payments representing 0.1% of the purchase price of each company, a request which was "contrary to Alliance's bizbuysell.com advertisement, the literature

---

[10] This language does not appear in the Agreement Zang relies on now, nor could we locate such language in any other documents presented to this Court during these summary judgment proceedings.

9

that Stern provided to Zang, and the oral representations made by Stern during the Parties' June 28, 2007 meeting and thereafter." (*Id.* at ¶¶ 13-17.) Zang alleges that Stern failed to follow through on both purchases. (*Id.* ¶¶ 14-16.)

Defendants moved to dismiss Zang's initial complaint arguing that the Court lacked jurisdiction over Zang's claims and that he failed to state a claim upon which relief could be granted. (*See* Defs.' Mem. in Supp. of Mot. to Dismiss [25].) The Court heard oral argument on defendants' motion to dismiss on January 29, 2009, at which time the parties reported that they had been engaging in settlement negotiations. (*See* Tr. of Proceedings on 1/29/09 [58].) Also at that time, defense counsel informed the Court that Burton Stern was very ill. (*Id.*)

To assist the parties in attempting to settle this matter, the Court set a settlement conference for April 30, 2009. Pursuant to this Court's Standing Order for Settlement Conference, the parties exchanged settlement demand and response letters, which were submitted to Chambers for review. But then, at plaintiff's request, the settlement conference was stricken on April 28, 2009.[11] (*See* 4/28/09 Order [43] & 4/30/09 Order [44].) Shortly thereafter, on May 7, 2009, this Court granted defendants' motion to dismiss in part and denied it in part. The Court dismissed plaintiff's Lanham Act claim with prejudice, but granted plaintiff leave to file an amended Count I under the Securities Exchange Act. (*See* Mem. Op. & Order [46].)

In his first amended complaint [51], plaintiff re-pled his claim under the Securities

---

[11] In a motion for leave to amend the complaint filed on May 21, 2009, plaintiff contended that he cancelled the settlement conference after learning of the Illinois Secretary of State Consent Order discussed above. (*See* Pl.'s Mot. for Leave to Am. Compl. [47].)

10

Exchange Act and, with leave from the Court (*see* 6/2/09 Order [50]), added a claim for violation of the Illinois Business Brokers Act. Defendants then sought to dismiss plaintiff's amended complaint, arguing once again failure to state a claim under the Securities Exchange Act and lack of subject matter jurisdiction over the state law claims. (*See* Defs.' Mem. in Supp. of Mot. to Dismiss Am. Compl. [54].) Plaintiff immediately sought leave to amend his complaint to add diversity jurisdiction as an additional basis for jurisdiction [59]. The Court granted plaintiff's request and denied defendants' second motion to dismiss as moot [62].

Plaintiff filed his second amended complaint [63] on July 24, 2009. In defendants' motion for an extension of time to answer or otherwise plead to that complaint, defendants informed the Court that Burton Stern had died on August 3, 2009. (Defs.' Mot. For Add'l Time [64] at ¶ 1.) The Court granted defendants' motion for an extension of time and defendants eventually filed their third motion to dismiss on October 1, 2009 [67]. In that motion, defendants again argued that plaintiff failed to state a claim under the Securities Exchange Act. Defendants also continued to argue that plaintiff's pendent state claims must be dismissed for lack of subject matter jurisdiction. (*See* Mem. in Supp. of Mot. to Dismiss Sec. Am. Compl. [68].)

After defendants' third motion to dismiss was briefed, but before a ruling was issued, defendants filed a Rule 25(a)(1) motion to dismiss Stern [76].[12] According to defendants, Stern must be dismissed because plaintiff failed to file a motion to

---

[12] Federal Rule of Civil Procedure 25 provides in relevant part: "If a party dies and the claim is not extinguished, the court may order substitution of the proper party... . If the motion [for substitution] is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Fed. R. Civ. P. 25(a)(1).

substitute within 90 days of receiving notice that he had died.  We disagreed and held that plaintiff's failure to file a timely motion to substitute was "excusable neglect" given that he was actively pursuing the information needed for that motion.  (*See* 1/22/10 Order [85].)  As such, we allowed plaintiff additional time to file his motion to substitute, which he did on February 23, 2010.  On March 25, 2010, this Court granted plaintiff's motion and Todd Stern, defendant Stern's son and the executor of his will, was substituted in this matter [94].

With the substitution issue resolved, on September 27, 2010, this Court entered a Memorandum Opinion and Order denying defendants' third motion to dismiss in part and granting it in part [104].  Specifically, we held that plaintiff failed to state a claim for violation of the Securities Exchange Act and dismissed that claim with prejudice.  As for the remaining state law claims, we held that those claims survived defendants' attack because there existed complete diversity and the amount in controversy requirement was satisfied.  Our ruling left plaintiff with the following state law claims (Counts II-VIII): (II) violation of the Illinois Consumer Fraud Act, (III) common law fraud, (IV) conversion, (V) breach of fiduciary duty, (VI) violation of the Illinois Deceptive Trade Practices Act, (VII) promissory estoppel, and (VIII) violation of the Illinois Business Brokers Act.

On October 18, 2010, defendants filed a motion for summary judgment, a supporting memorandum of law, and a Local Rule 56.1 statement of facts arguing (as now) that all of plaintiff's claims are barred by operation of the Illinois Dead Man's Act [107, 108, 109].  We denied that motion as premature, finding that discovery was necessary before such a motion could be resolved [111].  The Court also ordered defendants to file their answer to the remaining counts of plaintiff's second amended

complaint, which they did on November 4, 2010 [112]. In their answer, defendants provided the following response to most allegations of plaintiff's complaint: "Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations [contained in the preceding paragraph]."

At the Court's direction, the parties engaged in written and oral discovery through June of 2011, albeit minimal. As in their answer, for the most part, defendants' responses to plaintiff's interrogatories and requests to admit simply stated that they were without knowledge or information sufficient to respond to the requests. (*See* Pl.'s SOF at Exs. 13-16.) In response to plaintiff's requests for production of documents, defendants responded that none existed, but that "investigation continues." (*See* Pl.'s SOF at Exs. 17-18.) As for depositions, plaintiff did not notice any depositions and defendants took only the deposition of Patrick Nolan. The parties filed the pending motions for summary judgment after the close of discovery.

### C. Allegations of Spoliation

For the first time in his motion for partial summary judgment (initially filed on March 11, 2011, and re-filed on July 8, 2011 and April 16, 2012), plaintiff raised the issue of spoliation. As plaintiff explains, in response to certain interrogatories and requests for production regarding defendants' business records, defendants responded as follows:

> Upon the death of Burton Stern, Todd Stern as named executor of the Estate of Burton Stern discovered the office of the defendant in complete disarray. As the contents of the office including the unidentifiable piles of documents were lacking any sense of order or purpose and without monetary value, Todd Stern then disposed of all contents in the office shortly following the death of Burton Stern. Weeks later Stern learned of the instant litigation.

13

(*See* Pl.'s SOF at Ex. 13 ¶ 2, Ex. 14 ¶ 5.)  In response to another interrogatory, Todd Stern, in his capacity as executor, stated that "he first became aware of the instant lawsuit upon receiving contact from Defendant's attorneys through the attorney for the Estate of Burton Stern on or about September 3, 2009." (Pl.'s SOF at Ex. 14 ¶ 4.)  As discussed in detail below, plaintiff relies heavily on this destruction of documents both in support of his own motion summary judgment and in opposition to defendants' motion.

Following oral argument, plaintiff sought leave to supplement the record with an additional brief regarding the issue of spoliation [178].  We allowed plaintiff leave to file that brief [182] and directed defendants to file a response [183].  As discussed in more detail below, two additional affidavits on the issue of spoliation followed [187, 189].

## II.    Legal Standard

Summary judgment is appropriate where the evidence of record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  There is no genuine dispute of material fact when "no reasonable jury could find in favor of the nonmoving party."  *Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010) (*quoting Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007).  The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that a genuine issue of fact exists.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The court must construe all facts and draw all inferences from the record in favor of the nonmoving party.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Additionally, "a court may consider only admissible evidence in assessing a motion for summary judgment."  *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

## III.    Analysis

Defendants seek judgment in their favor on all seven remaining counts of plaintiff's second amended complaint, arguing primarily that those claims are barred by operation of the Illinois Dead Man's Act, 735 ILCS 5/8-201.  As for Count VIII, for violation of the Illinois Business Broker's Act, 815 ILCS 307/10-105, defendants also argue that plaintiff lacks standing to assert that claim.  For his part, plaintiff seeks judgment in his favor on Count VIII, as well as on Count IV for conversion.  Because both motions turn on the applicability and effect, if any, of the Dead Man's Act, we address that issue first.

### A.    The Illinois Dead Man's Act

The Illinois Dead Man's Act (the "Act") provides:

In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, except in the following instances:

(a) If any person testifies on behalf of the representative to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event.

(b) If the deposition of the deceased or person under legal disability is admitted in evidence on behalf of the representative, any

adverse party or interested person, if otherwise competent, may testify concerning the same matters admitted in evidence.

(c) Any testimony competent under Section 8-401 of this Act, is not barred by this Section.

(d) No person shall be barred from testifying as to any fact relating to the heirship of a decedent.

735 ILCS 5/8-201.

The purpose of the Act "is to protect decedents' estates from fraudulent claims and also to equalize the position of the parties with respect to giving testimony." *Ball ex rel. Hedstrom v. Kotter,* 746 F. Supp. 2d 940, 947-48 (N.D. Ill. 2010) (c*iting Gunn v. Sobucki*, 837 N.E.2d 865, 869 (Ill. 2005); *see also In re Estate of Gott*, 571 N.E.2d 1167, 1169 (Ill. App. Ct. 1991) ("The Act is not designed to disadvantage the living, but it is designed to protect estates against fraudulent claims being made by putting the parties on equal footing."). The Act does not bar testimony regarding "evidence of facts that the decedent could not have refuted." *Balma v. Henry*, 935 N.E.2d 1204, 1211 (Ill. App. Ct. 2010). It is well settled that the application of the Dead Man's Act is not only limited to trial, but is also applicable in the context of summary judgment proceedings. *Brown, Udell & Pomerantz, Ltd. v. Ryan*, 861 N.E.2d 258, 263 (Ill. App. Ct. 2006). *See also Rerack v. Lally*, 609 N.E.2d 727, 729 (Ill. App. Ct. 1992) ("It strains logic to construe the Dead Man's Act in a manner that forces litigants to proceed to trial when it would be evident from an application of the Dead Man's Act, in the context of a summary judgment proceeding, that a litigant cannot prove his case.").

**B.    The Application of the Dead Man's Act in Federal Court.**

Sitting in federal court, we must first determine whether the Illinois Dead Man's

16

Act applies here. Although, as a general matter, federal rather than state law governs the admissibility of evidence, there are a number of exceptions, including Federal Rule of Evidence 601. *Lovejoy Electronics, Inc. v. O'Berto,* 873 F.2d 1001, 1005 (7th Cir. 1989). That Rule provides:

> Every person is competent to be a witness unless these rules provide otherwise. But in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision.

Fed. R. Ev. 601. "The legislative history of Rule 601 reveals that the purpose of this exception was, precisely, to preserve state dead man's laws in cases such as this where state law supplies the rule of decision." *Lovejoy*, 873 F.2d at 1005 (*citing* H.R. Rep. No. 650, 93d Cong., 1st Sess. 9 (1973)).

Accordingly, where as here, Illinois law supplies the rule of decision for all of plaintiff's remaining claims, the Act is indeed applicable to determine the admissibility of evidence.[13] *See Ball*, 746 F. Supp. 2d at 948. Thus, we turn to the application of the Act to the facts to determine whether it does, as defendants contend, require judgment in their favor on all of plaintiff's claims. Before doing so, we note that this case presents an unusual interplay of issues, namely the competency of testimony under the Dead Man's Act, the confidentiality and admissibility of settlement statements, and issues of spoliation. Not surprisingly, neither the parties nor this Court has been able to uncover case law addressing an analogous situation.

### C. Whether Plaintiff's Claims Fail by Operation of the Dead Man's Act.

---

[13] Neither party has raised a choice of law issue and both parties rely on Illinois law in support of their respective motions. As such, we presume that the substantive law of Illinois governs. *See Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418, 421 (7th Cir. 1987) ("When the parties fail to consider the choice of law in a diversity case, the substantive law of the forum is presumed to control.") (quotation omitted).

As an initial matter, we easily conclude that Zang is an adverse party suing the representative of a deceased person. It follows then that pursuant to the Act, Zang is not allowed to testify on his behalf to any conversation with Stern or to any "event" that took place in the presence of Stern. 735 ILCS 5/8-201. Naturally, the practical effect of this prohibition on Zang's testimony requires an examination of the elements of each of plaintiff's claims. Strangely, in their motion for summary judgment, despite seeking judgment in their favor on all claims, defendants failed to address the elements of each remaining claim of plaintiff's second amended complaint. Instead, defendants argue, rather conclusorily, that all of plaintiff's claims are barred by operation of the Act. Then, in response, plaintiff addressed only three of his remaining claims, specifically conversion, breach of fiduciary duty, and violation of the Brokers Act. And again, in his own motion, plaintiff only sought judgment in his favor on his conversion and Brokers Act claims.

All of this left us uncertain as to whether the plaintiff was conceding that the Act barred his claims for violation of the Illinois Consumer Fraud Act, common law fraud, violation of the Illinois Deceptive Trade Practices Act, and promissory estoppel. At oral argument, plaintiff's counsel clarified that plaintiff was not conceding that any of his claims fail by application of the Act, including those that his briefs did not address. (2/10/12 Tr. at 17.) We also heard from defendants as to why, in their view, the Act bars all of plaintiff's claims. (*Id.* at 17-18.) In any event, the elements required to prove each of plaintiff's remaining state law claims are as follows:

**1.     Violation of the Illinois Consumer Fraud Act (Count II)**

To prevail on a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, the plaintiff must show "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009). The Illinois Supreme Court recently reiterated that an essential part of a claim under the Consumer Fraud Act is that "the plaintiff must actually be deceived by a statement or omission that is made by the defendant. If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause." *De Bouse*, 922 N.E.2d at 316.

### 2. Common Law Fraud (Count III)

Under Illinois law, to prevail on a claim for common law fraud the plaintiff must establish the following elements: (1) a false statement of material fact, (2) known or believed to be false by the person making it, (3) an intent to induce the plaintiff to act, (4) action by the plaintiff in justifiable reliance on the truth of the statement, and (5) damage to the plaintiff resulting from such reliance. *Doe v. Dilling*, 888 N.E.2d 24, 35-36 (Ill. 2008).

### 3. Conversion (Count IV)

To prevail on a conversion claim under Illinois law, "a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4)

the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Joe Hand Promotions, Inc. v. Lynch*, 822 F. Supp. 2d 803, 806 (N.D. Ill. 2011) (*quoting Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998)). Where a plaintiff alleges conversion of money, "[i]t must be shown that the money claimed, or its equivalent, *at all times* belonged to the plaintiff and that the defendant converted it to his own use." *Horbach v. Kaczmarek*, 288 F.3d 969, 978 (7th Cir. 2002) (*quoting In Re Thebus*, 483 N.E.2d 1258, 1261 (Ill. 1985)) (emphasis in original).

### 4. Breach of Fiduciary Duty (Count V)

Under Illinois law, the necessary elements of a breach of fiduciary duty claim are (1) the existence of a fiduciary duty, (2) breach of that duty, and (3) damages proximately resulting from that breach. *Autotech Tech. L.P. v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006).

### 5. Violation of the Illinois Uniform Deceptive Trade Practices Act (Count VI)

The Illinois Uniform Deceptive Trade Practices Act states, among other things, that "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person... advertises goods or services with intent not to sell them as advertised" or "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 ILCS 510/2.

### 6. Promissory Estoppel (Count VI)

"Promissory estoppel is a theory of recovery that provides a remedy 'for those who rely to their detriment, under certain circumstances, on promises, despite the absence of any mutual agreement by the parties on all the essential terms of a

contract.'" *Song v. PIL, LLC,* 640 F. Supp. 2d 1011, 1016 (N.D. Ill. 2009) (*quoting*

*Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 526 (Ill. 2009)).  To

prevail on a claim of promissory estoppel, plaintiff must prove that (1) defendant made

an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's

reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the

promise to its detriment.  *Id.*

### 7.      Violation of the Illinois Business Brokers Act (Count VII)

The Illinois Business Brokers Act defines a business broker as any person who

"in return for a fee, commission, or other compensation: (1) promises to procure a

business for any person or assists any person in procuring a business from any third

person; (2) negotiates, offers, attempts or agrees to negotiate the sale, exchange, or

purchase of a business; (3) buys, sells, offers to buy or sell or otherwise deals in options

on businesses; (4) advertises or represents himself as a business broker; (5) assists or

directs in the procuring of prospects intended to result in the purchase, sale, or

exchange of a business; (6) offers, promotes, lists or agrees to offer, promote, or list a

business for sale, lease, or exchange."  815 ILCS 307/10-5.10.  Every person engaged

in business brokering must, among other things, register with the Office of the Secretary

of State, provide a written disclosure with certain information to his client, and maintain

records for a period of six years.  *See* 815 ILCS 307/10-10, 815 ILCS 307/10-30, & 815

ILCS 307/10-75.  If a business broker commits a material violation of the Brokers Act in

connection with a contract for business brokering services, "the contract is void, and the

prospective client is entitled to receive from the business broker all sums paid to the

business broker, with interest and any attorney's fee required to enforce this Section."

815 ILCS 307/10–60. The Brokers Act applies "only when the person engaging or seeking to engage the business broker is domiciled in this State or when the company or business sought to be sold has its principal place of business in this State." 815 ILCS 307/10-105.

In their motion, defendants argue, and we agree, that if plaintiff's claims are premised solely on Stern's oral representations (as alleged in his current complaint), the Dead Man's Act requires the Court to enter judgment in defendants' favor on all of plaintiff's claims. As discussed above, plaintiff's second amended complaint makes no reference to a written agreement. Instead, in support of his claims, plaintiff relies solely on Stern's purported misrepresentations and promises made during their in-person meeting and subsequent phone conversations. In the affidavit submitted in connection with the pending motions, Zang has presented testimony regarding his initial meeting with Stern, his payments to Stern and the reasons therefor, Stern's failure to close on a business, and Stern's refusal to return his money. Pursuant to the plain operation of the Dead Man's Act, that testimony is barred.

We note that such a harsh application of the Act might have been avoided had plaintiff deposed Stern upon learning of his poor health. Indeed, Illinois Courts have ruled that admissions contained in the discovery deposition of a deceased individual can be used against the estate even if the estate does not waive protection of the Dead Man's Act. *See, e.g., Balma v. Henry*, 935 N.E.2d 1204, 1210-11 (Ill. App. Ct. 2010) ("We conclude that [defendant's] deposition is admissible even if [defendant's] estate had not waived the application of the Dead-Man's Act."). When asked at oral argument why plaintiff did not attempt to depose Stern, plaintiff responded that settlement

22

negotiations were ongoing and that the parties were not at issue at the time.  (2/10/10

Tr. at 5-6.)  While that may have been the case, at that point, it appears that the parties

may have already engaged in the requisite Rule 26(f) discovery conference (*See*

8/15/12 Joint Status Report to Judge St. Eve [18]), and there is no docket entry

indicating that discovery was ever stayed.  *See* Fed. R. Civ. P. 26(d)(1) (allowing

discovery to move forward following the completion of the Rule 26(f) conference; Fed.

R. Civ. P. 26(d)(2) ("Unless...the court orders otherwise, "methods of discovery may be

used in any sequence.").  Even if the parties had not yet had their discovery conference,

or had otherwise agreed to hold off on discovery, upon learning of Stern's poor health,

plaintiff should have sought, and the Court would likely have granted, leave to depose

Stern.

    In any event, without Zang's testimony as to his dealings with Stern, we are left

with Nolan's testimony, the written Agreement, the Bizbuysell advertisement, cancelled

checks, letters purportedly exchanged between the parties, and the Illinois Secretary of

State documents.  With respect to Nolan, his testimony is not barred by the Act as he is

a non-interested party.  *See Ball*, 746 F. Supp. 2d at 9 ("To disqualify a witness as

directly interested in the action, the witness's interest in the judgment must be such that

a pecuniary gain or loss will come to the witness directly as the immediate result of the

judgment.") (quotations omitted).  Unfortunately, on the whole, Nolan's testimony adds

little to create a genuine issue of material fact.  Again, Nolan testified that, based on his

conversations with Stern and Zang, he knew Stern was working with Zang to find

financing for the Frontline purchase and had about $32,000 of Zang's money, which he

presumed was for the Frontline deal.  But Nolan repeatedly testified that he was

23

unaware of any agreement, or terms thereof, between Stern and Zang.

This brings us to the written Agreement signed only by Stern. Strangely, in response to defendants' motion, Zang has not argued that the Dead Man's Act is inapplicable, that any of the exceptions to the Act apply, or that the defendants otherwise waived the application of the Act.[14] Instead, relying heavily on the Agreement, Zang argues that, even without his testimony, the documents in the record support judgment in his favor on his conversion and Brokers Act claim or, at a minimum, warrant denial of the defendants' motion.

With respect to his conversion claim, Zang contends that the language of the Agreemen (*i.e.,* that the consulting fee was only "earned and payable" if and when a closing of a business purchase took place), the cancelled checks, and the fact that no closing did in fact take place entitle him to judgment. We disagree for a number of reasons. First, the Agreement before us only contains Stern's signature and does not contain Zang's signature. Additionally, the Agreement is dated June 16, 2007, which pre-dates Zang's own recollection of when he first contacted Stern (June 19, 2007), and conflicts with the letter Zang purportedly sent Stern on June 25, 2007. (Zang Aff. at Ex. C.) Naturally, this calls into question whether the parties did in fact enter the Agreement that is before the Court.[15]

---

[14] As we discuss separately below, Zang does ask the Court to essentially waive the application of the Act as a result of defendants' alleged intentional spoliation.

[15] The agreement does indicate that it "shall be executed in two counterparts each of which shall be deemed to be an original." (Pl.'s SOF at Ex. 4.) Presumably, if Zang signed a copy of the agreement, it would have been retained by Stern and may have been destroyed when Todd Stern admittedly cleaned out his father's office. We also note that both in response to defendants' motion and in support of his own, plaintiff relies on admissions contained in the defendants' April 23, 2009 settlement letter. (Ex. 19 to Pl.'s Resp.) We will address those issues below.

More importantly, even if we concluded that the Agreement was binding, it does not answer the question as to why Zang gave Stern the additional two payments when the language of the Agreement itself does not call for any payments beyond the initial retainer. Notably, the third check was made payable to Mid-America Co., which Zang contends (without support) was an investment banking firm owned and operated by Stern. Again, Zang's testimony would be required to prove the purpose of those payments but, as we have already ruled, is barred.[16]

Further, as defendants argue, Zang's conversion claim hits another wall in that Zang voluntarily paid Stern. "Courts have consistently held that there is no conversion where one has voluntarily transferred money to another." *Tahir v. Import Acquisition Motors*, *L.L.C.*, No. 09 C 6471, 2010 WL 2836714, at *6 (N.D. Ill. July 15, 2010) (collecting cases). This principle has been applied in situations where, like here, the payor made up-front payments for products or services that were ultimately not provided by the payee.[17] *See, e.g., Horbach v. Kaczmarek*, 288 F.3d 969, 977 (7th Cir. 2002); *Tahir*, 2010 WL 2836714, at *6; *Baron v. Chehab*, No. 05 C 3240, 2006 WL 156828, at **10–11 (C.D. Ill. Jan. 20, 2006).

Zang takes a similar approach to his claim for violation of the Brokers Act, citing the documents in the record, namely the Illinois Secretary of State documents, and

---

[16] We note that Zang never included a breach of contract claim in any of his complaints despite making reference to such a claim in his demand letter to Stern. (*See* Pl.'s SOF at Ex. 12.) Nor has Zang argued that the Agreement is admissible under the exception to the Dead Man's Act regarding account books and records and other documents. *See* 735 ILCS 5/8-201(c) & 735 ILCS 5/8-401. At oral argument, plaintiff's counsel explained that he was not the attorney handling the case when the second amended complaint was filed, but that he was of the opinion that a "breach of contract claim would not ultimately further Zang's chances of recovering his damages." (2/10/12 Tr. at 3.)

[17] Again, to refute defendants' argument on this issue, plaintiff relies on the admissions contained in defendants' settlement letter, which we turn to in Section D below.

arguing that his testimony is not necessary to support that claim.  At first glance, the

Secretary of State documents appear particularly damning as the advertisement

described therein is indeed almost identical to the advertisement at issue here and was

purportedly disseminated in a similar time frame.  (*Cf.* Pl.'s SOF at Ex. 1, ¶ 11 *with* Pl.'s

SOF at Ex. 2.)  However, what Zang ignores, and defendants point out, is that the

Consent Order arising from Stern's publication of that advertisement is just that, a

consent order.  The plain language makes clear that defendants neither admitted nor

denied the truth of the allegations therein.  And, while courts may take judicial notice of

records from administrative proceedings, *see Menominee Indian Tribe of Wis. v.

Thompson*, 161 F.3d 449, 456 (7th Cir. 1998), "courts generally cannot take notice of

findings of fact from other proceedings for the truth asserted therein because these

findings are disputable and usually are disputed."  *General Elec. Capital Corp. v. Lease

Resolution Corp.*, 128 F.3d 1074, 1082 n.6 (7th Cir. 1997).

Additionally, the Brokers Act itself provides that only *certified* copies of Secretary

of State documents are admissible in actions or proceedings under the Act.  815 ILCS

307/10-50.  The documents submitted by plaintiff are not certified.  Nor has plaintiff

argued that the Consent Order before us should be construed as a "certificate" from the

Secretary of State showing compliance or non-compliance with the Act.  *See* 815 ILCS

307/10-45(d) (providing that such a certificate constitutes prima facie evidence of

compliance or non-compliance and is admissible in any court to enforce the Brokers

Act).  For these reasons, we disagree that the Secretary of State Consent Order is

alone dispositive on the issue of whether Stern was operating as an unregistered

business broker and, in turn, whether he failed to retain certain records as required by

26

the Act, and failed to provide Zang with the required written disclosures.

The applicability of the Dead Man's Act also leaves Zang's standing under the Brokers Act (as a Michigan resident) on shaky ground. Nolan's testimony as to the types of services Stern was providing Zang relates solely to the purchase of Frontline, an Indiana company, and does not support Zang's assertion of standing. (Nolan Dep. at 7.) Further, the list of businesses Stern purportedly provided Zang are insufficient to support Zang's standing, as his testimony would be necessary to show that Stern did in fact provide him with those listings.

In response to defendants' motion, Zang also argues that summary judgment is appropriate in his favor on his breach of fiduciary duty claim, despite having not sought judgment on that claim in his own motion. We easily disagree, as Zang has not presented competent evidence upon which we could determine a fiduciary duty arose. As forewarned, we now turn to the additional issues of spoliation and the settlement letters.

### D. Whether Todd Stern's Destruction of his Father's Documents Warrants a Sanction Forcing Defendants to Adopt the Statements Set Forth in their Settlement Letter.

Zang seeks to avoid the application of the Dead Man's Act with his allegations of intentional spoliation. As mentioned above, Todd Stern, the executor of the estate, has admitted to cleaning out his father's office after his death, thereby possibly destroying documents relevant to this action. Zang argues that as a sanction for such destruction, the Court should force the defendants to adopt the factual assertions contained in their April 23, 2009 settlement letter (drafted prior to Stern's death), and allow Zang to rebut those facts with his own testimony, thereby removing the protections of the Dead Man's

27

Act.  According to Zang, entering such a sanction would result in judgment in his favor on his claims for conversion and violation of the Brokers Act.

In their settlement letter, as required by this Court's Standing Order, defendants identified the points of plaintiff's demand letter with which they agreed.  Particularly, defendants, through counsel, agreed, among other things, that (1) Zang traveled to Chicago to meet with Stern on June 28, 2007, (2) that Zang and Stern entered into the written consulting Agreement (which they attached to the letter), (3) that Zang asked Stern to evaluate Frontline and provided Stern a check in the amount of $14,500, (4) that Zang asked Stern to evaluate Pine Tech and provided a check made payable to Mid-America in the amount of $18,000, and (5) that Stern did state that Alliance would hold the deposit until Zang had signed a letter of intent with Pine Tech.  (Ex. 19 to Pl.'s Resp.)  Defendants dispute the remainder of plaintiff's points and provide a number of assertions of their own.  For example, defendants contend that Stern provided accounting services and that Zang's payments were pre-payments for services to be rendered at $450 an hour, as opposed to down payments.  Attached to defendants' letter were certain documents and correspondence purportedly received from Zang. Defendants also wrote that "Alliance has hundreds of pages of financial records that it reviewed at Zang's request during the course of its engagement." (*Id.*)  Before addressing Zang's request to force defendants to accept the truth of these assertions, we must first address whether the settlement letter on which Zang relies is even admissible.

### 1.    Whether Defendants' Settlement Letter is Admissible.

Like defendants, we take issue with Zang's decision to submit the settlement

28

letter without first seeking leave from the Court. In doing so, plaintiff completely

disregarded this Court's own Standing Order, Local Rule 83.5, and Federal Rule of

Evidence 408.[18] Our Standing Order makes clear that the written demands and offers

required by the Court - which would include the defendants' letter here - are governed

by Local Rule 83.5. That Rule dictates that:

> all non-binding alternative dispute resolution ("ADR") proceedings referred
> or approved by any judicial officer of this court in a case pending before such
> judicial officer, including any act or statement made by any party, attorney or
> other participant, shall, in all respects, be privileged and not reported,
> recorded, placed in evidence, made known to the trial court or jury (without
> consent of all parties), or construed for any purpose as an admission in the
> case referred or in any case or proceeding.

Federal Rule of Evidence 408 also prohibits the admission of "conduct or a statement

made during compromise negotiations about the claim" to "prove or disprove the validity

or amount of a disputed claim or to impeach by a prior inconsistent statement or a

contradiction." Of course we recognize that the exception to Rule 408 allows the court

to "admit [such] evidence for another purpose." Fed. R. Ev. 408(b). Indeed, courts

often admit evidence regarding settlement negotiations when offered for another

purpose not prohibited by the Rule. *See Bankcard America, Inc. v. Universal Bancard*

*Systems, Inc.*, 203 F. 3d 477, 484 (7th Cir. 2000) (collecting cases).

Here, plaintiff has provided us little argument as to why defendants' letter should

be admitted in the face of Local Rule 83.5 and Rule 408. However, plaintiff has argued

---

[18] In their supplemental brief, defendants improperly cite to Local Rule 16.3 to support the
confidentiality of their settlement letter and the statements therein. That Rule establishes a program for
voluntary mediation for cases arising under the Lanham Act and further provides that all statements made
in such mediation proceedings are confidential. Although plaintiff initially included a claim under the
Lanham Act, there is no indication the parties participated in the mediation proceedings established by
that Rule. Thus, we disagree that the Rule provides additional confidentiality protections here.

that the letter provides proof that defendants destroyed relevant documents once in their possession. On this point we can agree, and we will allow plaintiff to rely on the letter in support of his spoliation allegations. However, in our view, whether plaintiff can rely on the factual assertions of that letter is a separate issue and turns on whether defendants did in fact engage in sanctionable spoliation of evidence.

### 2.    Whether Defendants Engaged in Spoliation of Evidence.

As plaintiff correctly acknowledges, courts have the inherent power to impose sanctions against a party or counsel for the failure to preserve or produce documents. *Chambers v. NASCO*, Inc., 501 U.S. 32, 49 (1991); *Barnhill v. U.S.*, 11 F.3d 1360, 1368 (7th Cir. 1993).[19] Sanctions may be appropriate "where the noncomplying party acted either with wilfulness, bad faith or fault." *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992); *Jones v. Bremen High Sch. Dist.*, No. 09 C 3548, 2010 WL 2106640, at *5 (N.D. Ill. May 25, 2010). Courts have broad discretion to choose an appropriate sanction for discovery misconduct based on the unique facts of every case. *Danis*, 2000 WL 1694325, at *31 (*citing National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, (1976)). Any award of sanctions must be proportionate to the offending conduct. *Ty Inc. v. Suzhou Young Chang Plastic Prods.*, No. 08 C 4217, 2010 WL 680932, at *2 (N.D. Ill. Feb. 22, 2010) (*citing Langley*, 107 F.3d at 515). We consider three factors in determining an appropriate sanction: (1) a

---

[19] Courts also have the statutory authority, under Rule 37, to sanction a party for the failure to preserve and/or produce documents where a court order or discovery ruling has been violated. *China Ocean Shipping (Group) Co. v. Simone Metals Inc.*, No 97 C 2694, 1999 WL 966443, at *2 (N.D. Ill. Sept. 30, 1999). The analysis for imposing sanctions under Rule 37 or our inherent power is "essentially the same." *Danis v. USN Communications, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *30 (N.D. Ill. 2000) (quoting *Cobell v. Babbit*, 37 F. Supp. 2d 6, 18 (D.D.C.1999).

Case: 1:08-cv-03370 Document #: 191 Filed: 06/21/12 Page 31 of 34 PageID #:1369

breach of the duty to preserve or produce documents, (2) the level of culpability for the breach, and (3) the prejudice that results from the breach. *Danis*, 2000 WL 1694325, at *31.

Here, defendants have openly admitted in their discovery responses and these summary judgment proceedings that Todd Stern cleaned out his father's office after his death. In doing so, we agree that Todd Stern likely destroyed relevant documents, including those referred to in defendants' settlement letter. But, defendants have also repeatedly asserted that Todd Stern was not aware of this action when he disposed of the documents. In defendants' view, plaintiff has thus failed to show a level of spoliation that would support the remedy he seeks.

To refute defendants' assertions, one would assume that plaintiff might have sought leave to depose Todd Stern upon learning he cleaned out his father's office. Plaintiff did not do so here. Instead, plaintiff has submitted merely speculative evidence to prove Todd Stern's knowledge of this action.[20] For example, plaintiff provided a February 4, 2009 e-mail from defense attorney Dan Austin relating to settlement discussions, in which Austin states, "We'll see if his children are willing to pay anything more, but they were not last time you offered $22,000 in October [of 2008]." (Pl.'s Supp. Brief [182] at Ex. B.) From this e-mail, plaintiff asks us to infer that defense counsel was in contact with Todd Stern as early as October of 2008. It would follow then that Stern was aware of this lawsuit when he destroyed the documents. But

---

[20] Plaintiff has also provided information regarding other legal proceedings in which Todd Stern was a party. Presumably, plaintiff wants us to infer intentional spoliation from Stern's allegedly checkered past. We decline to do so, as we find Stern's involvement in those proceedings irrelevant to this action.

31

defendants' attorneys have submitted affidavits indicating they did not speak to any of Stern's family members prior to his passing. Defense counsel also clarified on the record at the May 31, 2012 status hearing that it was Burton Stern who was in contact with his children regarding settlement negotiations. Even so, the e-mail makes clear that Burton Stern had more than one child. Thus, without more, we cannot conclude that Burton must have been in contact with Todd in October of 2008.

More recently, plaintiff submitted the affidavit of Marc Harris, the president of the property management company that managed Burton's Stern's office [187]. According to Harris, Alliance's lease was terminated on July 31, 2009 and a new tenant "commenced occupancy on that date." Plaintiff asks us to infer from this affidavit that Todd Stern could not have possibly cleaned out his father's office following his death because a new tenant had since moved in. We ordered Todd Stern to respond to this affidavit. Todd provided an affidavit indicating that the property management company contacted him following his father's death and informed him that some of his father's items remained in the unit and needed to be cleaned out, which he did [189]. Todd reiterated that he did not learn of this action until weeks after he cleaned out the office.

On this record, and absent stronger evidence indicating that Stern was aware of this lawsuit, we simply cannot award plaintiff the extraordinary remedy he seeks for what he views as intentional spoliation. Again, plaintiff asks us to force the defendants to adopt the statements in their settlement letter, allow plaintiff to testify, and enter judgment in his favor. Doing so would remove the protections of Rule 408 and the Dead Man's Act. With respect to Rule 408, in our view, plaintiff's proposed remedy would result in the improper admissibility of defendants' settlement statements for the

32

purpose of proving the validity of plaintiff's claims.  *See Burdick v. Koerner*, 988 F.

Supp. 1206, 1215 (E.D. Wis. 1998) ("Allowing the plaintiffs to introduce into evidence

the admissions of fact made by the defendants in the [settlement] letters would run

counter to the policy of fostering freedom of communication in settlement

negotiations.").

　　　　As for the prejudice Zang suffers as a result of the missing documents, we

disagree that it is as severe as he contends.  Again, even if the documents had not

been destroyed and certain account books and records were admissible under the

exception to the Dead Man's Act, because of the plain operation of that Act, Zang's

testimony as to his relationship and dealings with Stern would still be barred.

　　　　All of this leads us to conclude that without his own testimony, Zang has failed to

present competent admissible evidence to establish a genuine issue of material fact.

While this may seem an inequitable result, courts have entered summary judgment

where the plaintiff lacks sufficient proof to support his case after his own testimony has

been ruled inadmissible pursuant to the Dead Man's Act.  *See, e.g.*, *Kahn v. First Nat'l*

*Bank of Chicago*, 576 N.E.2d 321, 326 (Ill. App. Ct. 1991); *Kamberos v. Magnuson*, 510

N.E.2d 112, 115 (Ill. App. Ct. 1987).  And, as the Appellate Court of Illinois once noted,

although "[c]ommentators have long criticized the [Dead Man's] Act...any change should

come from the legislature, and not under the guise of judicial construction of the

statute." *Theofanis v. Sarrafi,* 791 N.E.2d 38, 53 (Ill. App. Ct. 2003) (citations omitted).

　　　　Lastly, this Court's Chambers recently received a call from plaintiff's counsel who

indicated that plaintiff intended to file a motion pursuant to Rule 11 of the Federal Rules

of Civil Procedure.  Given the 21-day grace period set forth in Rule 11, we are unaware

of the nature of that motion or if plaintiff did in fact serve a Rule 11 motion on defendants.  *See* F.R.C.P 11(c)(2).  In any event, we see no reason in further delaying our ruling on the pending motions.

## III.    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment [181] is granted and plaintiff's motion for partial summary judgment [180] is denied.  It is so ordered.

ENTERED:

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: June 21, 2012**

34